OPARA, APPELLEE, *v.* CARNEGIE
TEXTILE COMPANY, APPELLANT;
ADMINISTRATOR, BUREAU OF
EMPLOYMENT SERVICES, APPELLEE.

(No. 49096 — Decided May 20, 1985.)

*Dale B. Opara, pro se.*

*Alan W. Scheufler* and *Lawrence Friedlander,* for appellant.

*Anthony J. Celebrezze, Jr.,* attorney general, *Fred J. Pompeani, Q. Albert Corsi* and *Michael P. O'Grady,* for appellee Administrator.

MARKUS, J. The claimant's employer appeals from a determination that it discharged the claimant without just cause, so the claimant was entitled to unemployment compensation benefits. We hold that the agency's decision was unreasonable and against the manifest weight of the evidence in the administrative record. Therefore, we reverse the administrative decision and the common pleas court decision which affirmed it.

## I

The claimant's application for unemployment compensation benefits reported that his employer "fired" him, but the application provided no further explanation. In its response to the bureau's request for separation information, his employer explained:

"In front of witnesses, he told his co-worker, who was confined at one time in a concentration camp, that 'Hitler had the right idea.' This same co-worker lost both parents in the extermination camps. We were compelled to fire him."

By checking the appropriate block on its response form, the employer requested a fact-finding interview.

In his later written statement to the bureau, the claimant gave the following account of his termination from his position as a "shipping clerk":

"I was working with my boss Ernest Finley [*sic*] when I seen Eugene [Davidovitz] arguing with Ray Lott about being lazy. So being hot I went over [*sic*] told Eugene get back to his department. He said something smart back to me and I said Heil Hitler and Germany wasn't so bad either. Me and my boss Ernie went back to work both laughing. About a [*sic*] hour later Morris [Lebowitz] came out screaming and looked crazy and threw me out saying the Nazi [*sic*] killed his parents. Eugene was not on his side of the shop and giving people a hard time like always. Why did my boss not get mad for that remark. He only laughed. Eugene & Morris both are Jewish. How can you get fired for remarks."

The claimant signed that statement and a supplementary summary of his version which a bureau employee wrote for him:

"Eugene [Davidovitz] was arguing

with a black man. Jokingly I said something about Hitler & Germany. The black man and my boss laughed. Eugene walked away. The next thing I knew Morris [Lebowitz] came out screaming. Eugene was always said [*sic*] the Russians had the right idea. I was not aware that there had been incidents in a concentration camp. I was only trying to get the argument stopped and get Eugene back in his own dept. I never said anything about Germany before."

The administrator ruled in the claimant's favor and denied the employer's request for reconsideration. On the employer's appeal to the agency's board of review, the board's referee conducted a full evidentiary hearing at which four witnesses testified: Albert Kay (the company's vice-president), Ernest Findley (the company's warehouse supervisor), Morris Lebowitz (the company's secretary and production manager), and Dale Opara (the claimant).

Kay testified that the company acts as "general handlers of textiles for industry, commerce, and hospital use." The claimant worked under Lebowitz's supervision. He had been a satisfactory employee, but there had been some "differences" and oral "warnings" "regarding possible mistakes he made on individual shipments." The vice-president stated that the claimant was discharged because he made a statement that "aroused great feelings of animosity among his fellow workers, and his immediate superior." The vice-president was not present at that time, but he had been told that the claimant said, "Hitler was right."

When asked why the company felt the statement was particularly offensive, the vice-president explained:

"Well, we have two people here, Mr. Davidovitz, and Mr. Lebowitz, both of whom have recent European roots, whose families were decimated because of this kind of feeling in the, in the Hitler regime. I, they felt, and I feel, that

working with a person who had these feelings and was ready to verbalize them was just an intolerable situation, and they just couldn't work with him."

He added his own reaction to the reported statement by the claimant:

"My feelings about the holocaust, of course, are the same as most people of my religion, and if, I know that if I were there, if I had been there at the time, the same result would have taken place. You were talking here about something that is totally offensive to a race of people; and I don't know how any Jewish person could work with somebody who is ready to express that kind of an opinion. What we have here is a situation where it's intolerable to work with a person."

Findley testified that he was present at the altercation. He described "verbal skirmishes" between the claimant and Davidovitz for approximately one hour that morning. Davidovitz was head of the sewing department. Some of their "skirmishes" concerned Davidovitz' complaint that the claimant's girl friend was late for work that morning in Davidovitz' department. Their disagreements culminated when the claimant told Davidovitz: "Heil Hitler" and "Hitler should have killed all you Jewish people." Fifteen minutes later, Lebowitz confronted the claimant and asked what he had said to Davidovitz. The claimant acknowledged that he had said, "Heil Hitler," and Lebowitz then discharged him. The warehouse supervisor did not testify that he laughed at the remarks, as the claimant had originally reported.

Lebowitz testified that Davidovitz came to him that morning "very shaken" to make "a very emotional complaint." Davidovitz reported that the claimant said, "Hitler had the right idea about the Jews." Lebowitz recounted his reaction:

"I went out immediately and I told him to get out of it this second, I don't want to see him any more. Somebody who killed my family, my family, from

70 people came back three people came back; I cannot stand his sight at all. It's very utterly provocative."

He added that both he and Davidovitz had suffered in Nazi concentration camps.

Davidovitz was present at the hearing and available for questioning by either side. The employer's counsel reserved "the right to call him on rebuttal if Mr. Opara denies the factual basis of the * * * statements that were made in the testimony * * *."

The claimant was the final witness. He worked for this employer fourteen months before his discharge. He denied receiving any complaints about tardiness, absenteeism, or the quality of his work. He agreed that he had been "arguing" with Davidovitz that morning. The controversy concerned the claimant's girl friend and Davidovitz' complaint that another co-worker wasn't working hard enough. The claimant recounted that he said to Davidovitz: "Heil Hitler" and "Germany was okay. Germany was all right." He might have said "Germany wasn't so bad, either." When Lebowitz came to his work area shortly thereafter, the claimant acknowledged to him that he had said, "Heil Hitler."

The claimant testified that he made these remarks out of "disgust" rather than anger. He did not claim they were intended as jokes. The claimant further testified that he was not of German ancestry and that his father had "fought in World War II" "on the side of the allies." He said that "they've said stuff that was offensive to me," that Lebowitz had "yelled" at him more than once, and that Davidovitz frequently treated him like "a dummy."

The referee concluded that the employer discharged the claimant without just cause, so the claimant was entitled to benefits. The full board denied further review, and the common pleas court affirmed the agency's ruling.

## II

In its sole assignment of error employer contends:

"The Court of Common Pleas And The Unemployment Compensation Board Of Review Erred In Holding That Dale Opara, Who Voluntarily And Intentionally Disrupted And Interfered With Employee Working Relationships, Thereby Threatening The Operations Of The Employer, Was Discharged Without Just Cause."

In pertinent part R.C. 4141.29 provides:

"(D) Notwithstanding division (A) of this section, no individual may serve a waiting period or be paid benefits under the following conditions:

"* * * .

"(2) For the duration of his unemployment if the administrator finds that:

"(a) He * * * has been discharged for just cause in connection with his work * * *."

At the administrative hearing, the claimant had the burden of proving his eligibility for unemployment benefits. *Shannon* v. *Bur. of Unemployment Comp.* (1951), 155 Ohio St. 53 [44 O.O. 75]. The credibility of conflicting testimony and the weight given to evidence are primarily matters for the referee and board of review. *Brown-Brockmeyer Co.* v. *Roach* (1947), 148 Ohio St. 511, 518 [36 O.O. 167]; *Hall* v. *American Brake Shoe Co.* (1968), 13 Ohio St. 2d 11, 13 [42 O.O.2d 6]; *Fahl* v. *Bd. of Review* (1965), 2 Ohio App. 2d 286, 289 [31 O.O.2d 426]. A reviewing court should not reverse the agency's decision unless the court finds the decision was unlawful, unreasonable, or against the manifest weight of the evidence. R.C. 4141.28(O); cf. *Simon* v. *Lake Geauga Printing Co.* (1982), 69 Ohio St. 2d 41, 45 [23 O.O.3d 57].

However, the courts should reverse an agency's ruling which reaches an unreasonable conclusion from essential-

ly undisputed evidence at the administrative hearing. *Griffith* v. *Administrator* (Dec. 27, 1984), Cuyahoga App. No. 48301, unreported. That determination requires less deference to the agency because it resolves the legal effect of unchallenged facts rather than the existence of such facts. Cf. *Sellers* v. *Bd. of Review* (1981), 1 Ohio App. 3d 161; *Kubelka* v. *Bd. of Review* (Jan. 25, 1979), Cuyahoga App. No. 38098, unreported.

The claimant relies upon decisions that a single incident in which an employee used abusive language did not provide just cause for his discharge. *E.g., Hepner* v. *Bd. of Review* (App. 1978), 11 O.O. 3d 144, 148; *Sandridge* v. *Midland Steel Products Co.* (Aug. 21, 1980), Cuyahoga App. Nos. 41167 and 41185, unreported. Vulgar or profane language may provide just cause for a discharge if it also constitutes insubordination to the employee's supervisor. *Pence* v. *Beck-Talbert Pontiac, Inc.* (Mar. 16, 1982), Montgomery App. No. 7537, unreported. The agency may well have used such rulings as a basis for its decision. See, also, Annotation (1979), 92 A.L.R. 3d 106.

That line of cases recognizes that some workers might have an occasional outburst of obscene, vulgar, or profane language. Co-workers are reasonably expected to accept or countenance such action, so it should not be unduly disruptive to their employment. However, some language can be so disruptive and provocative that the employer's ability to maintain a productive environment is severely compromised.

An employee's act or threat of physical violence against a co-employee can provide just cause for a discharge which precludes unemployment compensation benefits. See Annotation (1983), 20 A.L.R. 4th 637. Some "fighting words" have the same effect in destroying the atmosphere necessary for cooperative activities by co-employees. The employer has just cause for discharging an employee who knowingly uses language which is very likely to provoke a violent response. Cf. *Goodloe* v. *Martin Marietta Corp.* (Colo. App. 1972), 496 P.2d 1060.

In this case, the claimant admits using highly inflammatory anti-Semitic phrases in arguing with a Jewish co-employee when he knew his supervisor was also Jewish. Members of certain racial and ethnic groups are understandably aroused by extreme bigotry which attacks their group. Their propensity to deep resentment or even violence in response to such remarks is well known, so anyone using such language presumably intends that consequence. Additionally, such language can reveal the user's fundamental prejudices which jeopardize continuing work relationships.

The claimant used these incendiary words at the conclusion of a lengthy argument. He apparently felt some longstanding displeasure about the treatment given him by his Jewish co-employee and his Jewish supervisor. In that situation his extreme anti-Semitic remarks were presumably intended to provoke a bitter response. They successfully disrupted employment that day and were likely to impair his working relationship for an extended interval with the subjects of his attack. The employer was justified in discharging him to alleviate the problem he created.

The agency's ruling was unreasonable and contrary to the manifest weight of the evidence. We sustain the employer's assignment of error and reverse the common pleas court judgment. We remand this case to the Bureau of Unemployment Compensation with instructions to deny this claimant's application for benefits.

*Judgment reversed.*

PARRINO, P.J., and ANN McMANAMON, J., concur.